

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN OPEN COURT
U.S.D.C. - Atlanta

MAR 1 4 2023

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

UNITED STATES OF AMERICA

*v.*

JOHN J. WOODS

Criminal Information

No. 1:23-CR-64

THE UNITED STATES ATTORNEY CHARGES THAT:

**COUNT ONE**
*(Wire Fraud - 18 U.S.C. § 1343)*

1. Beginning on a date unknown, but from in or about 2008, and continuing through in or about July 2021, in the Northern District of Georgia, the Defendant, JOHN J. WOODS, did knowingly devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts, well knowing and having reason to know that the pretenses, representations, and promises were and would be false and fraudulent when made and caused to be made and that the omissions were and would be material.

**Background**

2. At all times relevant to this Information, WOODS, a resident of Marietta, Georgia, directly or indirectly owned a majority interest in, and had the right to control of the operations of, Livingston Group Asset Management Company d/b/a Southport Capital.

3.   Southport Capital was a Delaware corporation with its principal place of business in Chattanooga, Tennessee. Southport Capital was an SEC-registered investment adviser with reported assets under management of approximately $824 million as of March 2021. WOODS served as the President of Southport Capital from in or about February 2017 through in or about August 2021.

4.   Horizon Private Equity, III, LLC ("Horizon") was a Georgia limited liability company with its principal place of business in Atlanta, Georgia. Horizon was originally formed in 2006 under a different name, with WOODS as the company's registered agent.

### Scheme to Defraud

5.   At all times relevant to this Information, WOODS had actual control over Horizon's assets and operations.

6.   In 2008, WOODS caused Horizon to purchase Southport, an SEC-registered investment adviser.

7.   Shortly after WOODS caused Horizon to purchase Southport, he placed a family member as the nominal manager of Southport.  At all times, however, WOODS had the right to control the operation and management of Southport.

8.   Beginning in or about 2008, through Horizon, WOODS began soliciting investors to invest in a fund called "Horizon Private Equity."

9.   Some of the investors who were solicited to invest in Horizon also were or became clients of Southport or another SEC-registered investment advisor in which WOODS was employed until December 2016.

2

10. WOODS, and other investment adviser representatives acting under his direction at Southport, told potential Horizon investors that they would receive returns of 6-7% interest on their investment, paid in monthly installments for two to three years, and that Horizon would earn a return by investing their money in, for example, government bonds, stocks, or small real estate projects.

11. Most investors were not given any written materials setting forth the terms of their Horizon investments. Instead, they relied on oral descriptions of the investment provided by WOODS or other Southport investment advisers.

12. As part of the scheme to defraud, WOODS made and caused others to make the following material misrepresentations to investors:

    a. that returns to Horizon investors would be paid from investments held by Horizon;

    b. that Horizon investors would receive a "locked in" rate of return for at least one year;

    c. that Horizon investors could redeem their principal investment in full at any time without penalty upon ninety days' notice; and

    d. that Horizon investments carried minimal risk and were safe because Horizon had a diverse portfolio, including substantial investments in U.S. Treasury securities, collateralized mortgage obligations, and structured products.

13. Contrary to these representations made or caused by WOODS, as WOODS well knew, returns to Horizon's investors were paid largely from newly invested

funds coming from existing and new investors and not from Horizon's investments or earnings, Horizon's ability to continue paying the "locked in" rate of interest was dependent on liquidating existing investments or raising and using new investor money, the investments in Horizon did not carry minimal risk, Horizon could not meet investor redemption requests if all investors requested the return of their principal investment because most of Horizon's investments were illiquid, and Horizon's ability to repay all of its investors' principal hinged entirely on the future success of a single, illiquid investment—Horizon's ownership interest in Southport Capital.

14. Moreover, WOODS did not tell investors in Horizon—most if not all of whom were clients to whom he owed a fiduciary duty—that investor funds would or could be used to make payments to earlier investors, either for the payment of interest or for the return of principal.

15. WOODS, in fact, caused investments into Horizon to be used to pay returns to earlier investors. As WOODS well knew, Horizon was only able to pay guaranteed returns to investors by raising and using new investor money. Horizon did not earn any significant profits from legitimate investments; instead, a very large percentage of purported "returns" to earlier investors were simply paid out of new investor money.

16. The scheme also caused a third-party custodian of the investors' accounts to unwittingly issue misleading quarterly Account Statements to investors that denoted, among other things, the "market value" of the investors' accounts.

These quarterly statements misrepresented and overstated the amount and availability of funds that investors held in Horizon by not accounting for, among other things, the investment funds used to pay returns to earlier investors.

17. WOODS also caused Horizon to issue monthly statements to investors that denoted, among other things, the amount of their original investment, the interest paid, and the percentage return that the interest constituted based on the original investment. These monthly statements fraudulently misled investors by failing to disclose that the Horizon investments had not generated a positive percentage of return sufficient to cover the interest and simply paid the interest using new and existing investor funds. The monthly statements also fraudulently misled investors into believing that their investment was available for redemption at the full amount they had originally invested when in truth the fund had insufficient cash and other liquid assets to repay such principal if all or a substantial majority of the investors chose to redeem their investments in Horizon all at once.

18. As of the end of July 2021, Horizon investors were owed over $110,000,000 in principal investment amounts. There were more than 400 investors, residing in at least 20 different states, who held investments in Horizon. Investors lost more than $25 million as a result of the scheme to defraud.

### Execution of the Scheme

19. To execute this scheme to defraud, WOODS caused the transmission of interstate wire communications. Among other executions of the scheme, on or

about June 21, 2021, in the Northern District of Georgia, WOODS, for the purpose of executing and attempting to execute the scheme and artifice to defraud described above, and to obtain money and property by means of false and fraudulent pretenses, representations, promises, and omissions, with intent to defraud, did cause to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds, that is, WOODS caused victim S.W. to wire approximately $251,777 to a Horizon bank account at Iberia Bank to invest in Horizon based on material misrepresentations and omissions.

All in violation of Title 18, United States Code, Section 1343.

### Forfeiture Provision

20.  Upon conviction of the offense under Title 18, United States Code, Section 1343 charged in Count One, the Defendant, JOHN J. WOODS, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(2) and Title 28, United States Code, Section 2461(c), any property constituting or derived from proceeds obtained directly or indirectly as a result of the violation.

21. If, as a result of any act or omission of the Defendant, any property subject to forfeiture:

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred or sold to, or deposited with, a third person;

      c.  has been placed beyond the jurisdiction of the Court;

      d.  has been substantially diminished in value; or

e.  has been commingled with other property that cannot be subdivided

without difficulty;

the United States intends, pursuant to Title 18, United States Code, Section 982(b)

and Title 21, United States Code, Section 853(p), and Title 28, United States Code,

Section 2461(c), to seek forfeiture of any other property of the defendant up to

the value of the forfeitable property.

RYAN K. BUCHANAN
  *United States Attorney*

ANGELA ADAMS
  *Assistant United States Attorney*
Georgia Bar No. 613114

STEPHEN H. MCCLAIN
  *Assistant United States Attorney*
Georgia Bar No. 143186

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

7