IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| UNITED STATES OF AMERICA | Criminal Action No. |
|---|---|
| v. | 1:23-cr-0064-SEG |
| JOHN J. WOODS | |

**Government's Sentencing Memorandum**

The United States of America, by Ryan K. Buchanan, United States Attorney, and Angela Adams and Stephen H. McClain, Assistant United States Attorneys for the Northern District of Georgia, files this Sentencing Memorandum in preparation for sentencing on February 1, 2024, at 2:30 p.m., in the above-captioned matter. For the reasons stated below, the Court should find that the applicable offense level is 34 and apply a two-level downward variance, yielding a total adjusted offense level of 32. Because John Woods ("Woods" or "the Defendant") has a criminal history in Category I, the applicable advisory Guidelines range would be 121-151 months. Pursuant to the terms of the plea agreement, the United States asks the Court to impose a sentence at the low-end of the Guidelines range, which will provide appropriate punishment for the instant offense, but not a sentence greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

1

I. **Relevant Background**

A. Woods' Offense Conduct

Defendant John J. Woods facilitated a massive Ponzi scheme.[1] This Ponzi scheme lasted for more than a decade and cost hundreds of victims a combined

---

[1] Woods objects the use of the term "Ponzi scheme" in the PSR. Although this is a non-Guidelines issue that was resolved by Probation's willingness to remove the term from the PSR, it should be noted that Woods' conduct fits squarely within the definition of a Ponzi scheme. In *United States v. Silvestri*, the Eleventh Circuit noted that "[g]enerically, a Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." 409 F.3d 1311, 1317 n.6 (11th Cir. 2005) (citing *In re Bonham*, 229 F.3d 750, 759 (9th Cir. 2000)). It is undisputed in this case that monies paid by later investors were used to pay returns to earlier investors. And Woods, and those he directed, continually sought to attract new investors as evidenced by the number of investors that were solicited (and fell victim to the scheme) over the course of several years.

In his objections, Woods distinguishes his conduct from a general description of a Ponzi scheme found in a 2010 FBI article. Even in the article cited by Woods, the FBI explains that "instead of investing victims' funds, the operator pays 'dividends' to initial investors using the principal amounts 'invested' by subsequent investors." (PSR at 9-10). Although this language is still directly analogous to the conduct in this case, Woods seems to suggest that because he did not fabricate documents like Bernie Madoff, or flee with all proceeds of the fraud, or because Horizon held some investments (such as a baseball team), his scheme should not be classified as a Ponzi. Here, Woods seeks to ignore the very nature and heart of his scheme: Woods guaranteed high rates of return to Horizon investors, failed to make the type of promised investments with investment funds, and used money received by new investors to pay earlier investors (while concealing this from the investors). This is a quintessential Ponzi scheme, despite whether Woods finds the term flattering or not.

loss of more than $49 million. Woods operated this Ponzi scheme from at least 2008 until he was shut down by the U.S. Securities and Exchange Commission in 2021.

Specifically, from at least 2008 until 2021, Woods was the registered agent for Horizon Private Equity, III, LLC ("Horizon"). (PSR ¶ 8). Woods had actual control over Horizon's assets and operations, and he had ultimate control over the use and disposition of investor funds. (PSR ¶ 11). During this time, Woods was also the majority owner of Southport Capital, an SEC-registered investment adviser. (PSR ¶ 13).

Shortly after Woods purchased Southport, his brother and cousin, both registered investment advisors, left their jobs at Oppenheimer to work at Southport with Woods. (PSR ¶¶ 18, 20). As the majority owner, and later President of Southport, Woods used Southport's offices and employees to carry out his Ponzi scheme. (PSR ¶ 10). Starting as early as 2008, Woods, and the other investment advisors who worked for Woods, started soliciting individuals for investments in Horizon. (PSR ¶¶ 16, 18). Woods, and the other investment advisers who worked for Woods, told potential investors that they would receive returns of between 6 to 7% interest, guaranteed for two to three years, for nonspecific investments in the Horizon fund. (PSR ¶¶ 9, 16-20). In addition to the guaranteed rate of return, Woods promised potential Horizon investors that Horizon would invest their money in, for example, government bonds and collateralized mortgage obligations, and that these investments carried minimal risk and were safe due to Horizon's diverse portfolio. (PSR ¶ 23).

Contrary to these representations, however, the money collected from new investors was used largely to pay returns to previous investors. (PSR ¶¶ 28, 30-35). In fact, Horizon was able to pay guaranteed returns to investors *only* by raising and using new investor money or liquidating existing investments. (PSR ¶¶ 30-35). The investments in Horizon did not carry minimal risk and Horizon could not meet investor redemption requests if all investors requested the return of their principal investment at once. (PSR ¶¶ 30-35). Woods, who had actual control over Horizon's assets and operations, managed the disposition of investor funds. (PSR ¶ 11). Each month, Woods obtained spreadsheets specifying the amount each Horizon investor was owed in interest. (PSR ¶ 28). Woods would then transfer money from bank accounts controlled by Horizon to investors. (PSR ¶ 28). Substantial portions of the funds Woods caused to be transferred to make interest payments to investors came from new investor money. (PSR ¶ 28). Woods, however, never told Horizon investors that their investments would or could be used to make payments to earlier investors, either for the payment of interest or for the return of principal. (PSR ¶ 24).

In the end, more than 400 investors suffered as a result of Woods' Ponzi scheme. (PSR ¶ 8). And, they have collectively sustained a loss of over $49 million. (PSR ¶ 8).

B. <u>Charges and Plea Agreement</u>

While being investigated by the SEC for civil securities violations, Woods, through his attorney, contacted the U.S. Attorney's Office and expressed his intent to resolve any potential criminal charges. On March 14, 2023, Woods waived

indictment and was charged in a one-count Criminal Information with wire fraud, in violation of 18 U.S.C. § 1343. (Doc. 1).

On March 23, 2023, Woods pleaded guilty to his conduct in the scheme. (Doc. 8). In the plea agreement, the United States and Woods agreed that:

- the applicable base offense guideline is U.S.S.G. § 2B1.1(a)(1), which yields a base offense level of 7;
- the amount of loss resulting from the offense(s) of conviction and all relevant conduct is more than $25,000,000 but less than $65,000,000, which yields a 22-level upward adjustment pursuant to § 2B1.1(b)(1)(L);
- a 4-level upward adjustment should be applied pursuant to § 2B1.1(b)(2)(B) because the offense resulted in financial hardship to more than five but less than 25 victims; and
- a 4-level upward adjustment pursuant to § 2B1.1(b)(20)(A) should be applied because the offense involved a violation of securities law and, at the time of the offense, Woods was a registered broker and investment advisor.

(Doc. 8-1).

The United States agreed to recommend a 2-level sentence adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), together with an additional 1-level increase under U.S.S.G. § 3E1.1(b). Pursuant to these calculations, the total adjusted Guidelines offense level would be 34. The United Sates further agreed to recommend a 2-level downward variance and a sentence at the low end of the resulting Guidelines range. This would make the total adjusted offense level 32.

With a criminal history category I, this yields a Guidelines range of 121-151 months.

## II.　The Probation Office's Calculated Guidelines Range

According to the PSR submitted by the U.S. Probation Office ("Probation"), pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7. Pursuant to § 2B1.1(b)(1)(L), the base offense level is increased by 22 levels because the loss in this case exceeds $25 million but is less than $65 million. Probation further recommends that, pursuant to § 2B1.1(b)(2)(C), the base offense level be increased by 6 levels because the offense resulted in substantial financial hardship to 25 or more victims. Pursuant to § 2B1.1(b)(2)(A(ii) and (iii) the base offense level is increased by 4 levels because the offense involved a violation of securities law and, at the time of the offense, Woods was a registered broker and investment advisor. With a 3-level reduction for acceptance of responsibility, Probation found that the total adjusted offense level is 36. With a criminal history category I, the Guidelines range calculated by Probation is 188-235 months.

Both parties have lodged objections to Probation's Guidelines calculation. For the reasons outlined below, the United States objects to Probation's assessment of 6 levels for substantial financial hardship and believes that an upward adjustment of only 4 levels should be assessed. In addition, the United States will recommend a 2-level downward variance based on all the § 3553(a) factors, including Woods' decision to plead early and preserve government resources.

Woods has objected to, among other things, Probation's failure to assess a 2-level downward adjustment pursuant to 4C1.1 due to Woods' zero-point offender

status. Woods' objection should be overruled because 4C1.1 does not apply in this case.

### III. The Defendant Should Receive a 4-Level Upward Adjustment for Causing Substantial Financial Hardship.

Section 2B1.1(b)(2)(B) of the Sentencing Guidelines requires a court to increase a defendant's base offense level by 4 levels "if the offense . . . resulted in substantial financial hardship to five or more victims." Section 2B1.1(b)(2)(C) provides that 6 levels should be assessed "if the offense . . . resulted in substantial financial hardship to 25 or more victims." Based upon its assessment of the case at the time it entered into the negotiated plea agreement with Woods, the United States believed that it would be able to prove that at least five, but fewer than 25, victims suffered financial hardship from Woods' conduct.

This assessment was informed, in part, by the particular requirements needed to satisfy the definition of "substantial financial hardship" as set forth in the Guidelines. Specifically, Application Note 4(F) of § 2B1.1 instructs that "[i]n determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider [certain] factors, among other[s]." The considerations include whether the offense resulted in the victim:

> (i) becoming insolvent;
>
> (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);
>
> (iii) suffering substantial loss of a retirement, education, or other savings or investment fund;

(iv) making substantial changes to his or her employment, such as postponing his or her retirement plans;

(v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and

(vi) suffering substantial harm to his or her ability to obtain credit.

U.S.S.G. § 2B1.1, cmt. n.4 (2023).

After Woods entered his guilty plea, the U.S. Attorney's Office, in its normal course, mailed out requests for victim impact statements. The U.S. Attorney's Office received dozens of the impact statements from Horizon investors in this case.

Upon review of these statements, it is clear that this case easily warrants the 4-level increase, pursuant to § 2B1.1(b)(2)(B), because more than five victims suffered the type of substantial financial hardship defined in § 2B1.1. The impact statements submitted by several of Woods' victims bear this out. The following excerpts are illustrative:[2]

- Victim S.D.: I was getting close to retiring from the public school system and was relying on this investment to be able to do so without living paycheck to paycheck. Now I will be unable to do so.

- Victim D.M., an 86-year-old widow: I lost sleep because I lost my three children's inheritance.

---

[2] The undersigned has attempted to set forth verbatim excerpts of the mostly handwritten victim impact statements. Some excerpts, however, contain slight modifications for the purpose of clarity.

- <u>Victim C.S.</u>: It has cost me $183,000. Created distress for me and my wife. It was my total savings. I am retired and income comes from social security. C.S. also mentioned "lower standard of living."

- <u>Victim J.F. & S.J.M.</u>: My wife and I lost total control on where we were going in life. We had to stop looking for a house we were trying to buy at the time and ended up in a very small rental townhouse that has lasted three years …In our retirement years we are on a very tight budget to include one car and using public transportation.

- <u>Victim N.L.M.</u>: My wife—age 75—was going to retire in 2020, but she has retained her job and we cannot foresee a retirement date . . . I have lost a sizeable amount of my retirement savings. I am 75 years old and am not able to return to work.

- <u>Victim T.M. & B.M</u>: John J. Woods stole our total investment with Horizons, he also stole our lifestyle livelihood and retirement investment . . . We are no longer free because of John J. Woods & his partners and/or employees.

- <u>Victim A.M.</u>: I am a 71 yr. old widow living on a fixed income. The investment of my late husband's retirement money supplemented my monthly income. Because of John Woods and M.M.'s criminal actions, I was unable to make ends meet and had to get a full time job.

- <u>Victim J.E.</u>: As a retiree, this has affected my work in that I am forced to work part-time. Fortunately, although partially disabled, my health is such that I can work.

- <u>Victim R.B. – 27 yrs. in the Air Force</u>: The loss of ½ of my life savings was catastrophic ($700,000) . . . I had to get a part-time job to help pay the bills.

- <u>Victim E.H. - 71 yrs. old</u>: I saved for years in a 401k to help supplement my income and be able to travel some and now we are living off of our social security and have had to get a job to make ends meet since this happened in 2021.

- <u>Victim D.L. & B.L.</u>: This money was for my retirement, medical expenses, nursing home expense, funeral expenses, unforeseen expenses, housing debts, etc. I am now having to work 35-40 hours a week to make ends meet…I am working two jobs now cause I don't have enough income on social security to live.

- <u>Victim B.H.</u>: My IRA represented my savings from 40+ years of work. If John Woods had not essentially stolen this money, we could pay off our mortgage and my husband could retire.

- <u>Victim J.E.</u>: I have come to realized that I have lost much more than just my life savings. Gone now along with my savings is the standard of living to which I was accustomed, a general sense of financial security, and even the modest retirement I worked so hard for and once envisioned. Now forced to return to work part-time.

The victim impact statements support application of the enhancement for causing substantial financial hardship to victims, as the parties agree.

The Probation Office has, however, identified victim impact statements from 62 victims whom it believes suffered substantial financial hardship as a result of Woods' scheme. Thus, Probation has assessed a 6-level increase (as opposed to a 4-level increase) because it identified more than 25 qualifying victims. The United States does not dispute that at least 25 victims submitted statements expressing the type of substantial financial hardship contemplated by the Guidelines. At the time of the plea, however, the United States had not interviewed all 400 victims and was unaware of the information later provided in the victim impact

10

statements. This was due in large part to the fact that Woods admitted to his criminal conduct pre-indictment and allowed the United States to preserve considerable investigative resources. In this case, the United States requests that the Court assess a 4-level enhancement for substantial financial hardship pursuant to § 2B1.1(b)(2)(B) rather than the 6-level enhancement recommended by Probation.

### IV. The Court Should Overrule the Defendant's Objection to a Two-Level Downward Adjustment Pursuant to § 4C1.1.

Woods objects to Probation's finding that he is ineligible for a zero-point offender reduction under § 4C1.1 because he caused substantial financial hardship to his victims. The relevant portion of § 4C1.1 provides that defendants with zero criminal history points, like Woods, can receive a 2-level decrease in their offense level if, among other things, "the defendant did not personally cause substantial financial hardship." U.S.S.G. § 4C1.1(a)(6). Section 4C1.1(b)(3) further instructs that "[i]n determining whether the defendant's acts or omissions resulted in 'substantial financial hardship' to a victim, the court shall consider, among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the Commentary to §2B1.1." Application Note 1 to 4C1.1(b)(3) further advises that the application of subsection (a)(6) is to be determined independently of the application of subsection (b)(2) of § 2B1.1.

Although Woods agrees that several victims suffered financial substantial financial hardship (as discussed above), Woods argues that he did not *personally* cause the substantial financial hardship to any of the Horizon investors as the

exclusion to § 4C1.1 requires. Woods argues that his personal responsibility for victims' harm somehow disappeared when other investment advisors – namely Mike Mooney, Britt Wright, and Penny Flippen - solicited the investors who in fact suffered substantial financial harm. This position is completely inapposite to the facts of this case and contradicts other positions simultaneously maintained by Woods.

For starters, Woods has pleaded guilty to facilitating a multi-million-dollar fraud scheme. He was not charged in a conspiracy, nor were others indicted or unindicted co-conspirators mentioned in the Criminal Information. At the plea hearing on March 23, 2023, the United States provided a lengthy description of the facts of the case so that the Court could determine that there was a factual basis for the plea. The United States explained that other advisors acted at the direction of Woods when they were soliciting potential investors and making misrepresentations about the nature of the investments. Following the government's statement of facts, Woods' counsel made objections to some characterizations used, but counsel never objected to that fact that Woods directed others. The undisputed facts of the PSR also make clear that Woods, as the majority owner and President of Southport, used Southport's offices *and employees* to carry out his Ponzi scheme. (PSR ¶ 10). And, Woods was the person with actual control over Horizon's assets and operations, and had ultimate control over the use and disposition of investor funds. (PSR ¶ 11).

Most tellingly, the objections that Woods affirmatively lodged to the initial PSR underscore his understanding and belief that he is the only individual personally

responsible for the offense to which he has pleaded guilty. For example, to challenge a 4-level role enhancement initially assessed by Probation, Woods made clear that he is "unaware of evidence potentially establishing the existence of at least one criminally culpable participant other than Mr. Woods." (PSR at 22-23). As this position is consistent with the United States' current assessment of the evidence known at this time, the United States joined in the objection.

In addition, Woods objected to Probation's characterization of other Southport employees as "unindicted co-conspirators." (PSR at 14). He specifically objected to the use of the term "unindicted co-conspirator" in reference to James Woods, Jr., Mike Mooney, Darriel Johnson, Richard Whitley, Penny Flippen, and Britt Wright. (PSR at 14). Woods has benefited from the assertion that he was the only criminal participant in the offense: Probation reduced its 4-level enhancement for role to zero and deleted all references to "unindicted conspirators" in the PSR.

Now, in what appears to an about-face, Woods asserts that he should receive a 2-level downward departure because he was not personally responsible for the substantial financial harm caused to investors. He claims that Mike Mooney, Britt Wright, and Penny Flippen - the individuals whom he affirmatively noted were not criminally culpable participants and not his co-conspirators – are somehow the individuals responsible for causing substantial financial harm to investors. (PSR at 24-26). Woods cannot have it both ways. Either he, in fact, worked with others to perpetuate the scheme and is subject to a 4-level role enhancement or, consistent with his role objection, is the only person criminally responsible for the offense and, thus, personally—indeed, solely—responsible for the harm caused to the

13

victims of his offense. Woods' competing positions are grounded in convenience. In one instance he attempts to minimize the involvement of others to receive the benefit of no role enhancement, and, in another, he seeks to maximize the role of others and distance himself from the harm caused to victims in an attempt to realize the benefit for zero-point offenders under § 4C1.1. This argument is at war with itself and should be rejected by the Court.

Moreover, contrary to Woods' claims about victim C.S., Woods is in fact responsible for the harm to him. In his victim impact statement, C.S. explained that he lost $183,000, which was his total savings. Woods, nevertheless, seeks to diminish the impact that his crime had on this victim, who Woods describes as a "personal client." (PSR at 25). Woods suggests that because, as it appears to Woods, this victim has been made whole through various legal proceedings and because the victim has other investments, he did not suffer substantial financial hardship. The contention that an investor who had to submit to years of protracted litigation in order to recoup his stolen investment could not have suffered substantial financial hardship is untethered to reality and flawed.[3]

---

[3] To the extent Woods challenges the Court's consideration of the victim impact statements, the challenge should be rejected. *See United States v. McElroy*, 353 F. App'x 191, 194 (11th Cir. 2009) (citing *United States v. Rodriguez,* 765 F.2d 1546, 1555 (11th Cir. 1985)) (district court did not abuse its discretion by considering victim impact statements because sentencing judges "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come"); *United States v. Cazimero*, 712 F. App'x 670, 671 (9th Cir. 2018) (consideration of unsworn victim impact statements did not violate due process at sentencing of defendant who pled guilty to wire fraud); *United States v. Bolze*, 444 F. App'x 889, 891–92 (6th Cir. 2012) (in

## V. United States' Sentencing Recommendation

The statutory factors found in 18 U.S.C. § 3553(a) support the United States' requested 121-month sentence. Those factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment," "to afford adequate deterrence to criminal conduct," and "to protect the public," and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

As to the first factor, the nature and circumstances of Woods' offense are serious, warranting a significant prison sentence. Woods' criminal activity resulted in a loss of over $49 million, victimized over 400 investors, and devastated the lives of many, including retirees, seniors, and veterans. In order for Woods' Ponzi scheme to work, he had to cultivate trusting relationships with his investors. (PSR ¶ 25). He used those relationships to lull investors into a false of security by promising a guaranteed rate of return and convincing them that their savings were safe with Horizon. (*see* PSR ¶ 23). Despite the fact Woods owed investors a fiduciary duty, he misrepresented facts that he knew to be untrue. He made promises that he knew Horizon could not keep. (*see* PSR ¶ 23). He deliberately hid

---

Ponzi scheme case, court could consider all information relevant to sentencing, including victim statements without regard to whether that information would be admissible at trial as the Crime Victims' Rights Act gave the district court express authority to consider victim impact statements.).

from investors that their money was not being used to make the promised investments; instead, the money was being transferred, by Woods, to other investors and disguised as interest. (PSR ¶¶ 23, 28). Investors trusted Woods, but his criminal actions have left a wake of destruction in the victims' lives.

The victim impact statements discussed above exemplify the severe damage that Woods has inflicted on his victims. The harm suffered by many victims in this case is not just financial, it extends to both mental and emotional trauma. As some victims have explained:

- <u>Victim S.D.</u>: This has greatly affected my health, including increased high blood pressure problems and depression related to the worry of losing my investment.

- <u>Victim W.H.</u>: The inability to use these funds . . . gave me some very strong feelings of loss, anger, and depression. . . . My anxious state of mind has made it difficult for me to maintain healthy relationships with family and friends.

- <u>Victim J.D</u>: I was put on depression medications and my wife and I lost total control on where we were going in life. . . Socially we have withdrawn and much is due to expense. We have lost some of our closest friends over this.

- <u>Victim R.J.</u>: This is a close second to the loss of our son. One person took the life of our son and another took our livelihood. We feel so much anger toward John Woods, we relied on his investment (Horizon Private III) and B.W. (Southport Capital) who we trusted with our investment.

The damage here is far more than financial. Woods' sentence should reflect the seriousness of his crime and the grave impact he has had on victims.

The need for general deterrence in a case like this is exceptionally high, further supporting the recommended sentence. A sentence of 121 months would serve as needed deterrence for other individuals—especially sophisticated professionals entrusted with retirees' and others' money—who might consider engaging in similar financial frauds, including Ponzi schemes, that have a detrimental effect on the lives of trusting investors. When advisors, like Woods, have accesses and control of individuals' finances it is important that they think twice before mishandling those funds. Courts in this Circuit have "expressed the view that '[g]eneral deterrence is more apt, not less apt, in white collar crime cases."' *United States v. Oudomsine*, 57 F.4th 1262, 1267 (11th Cir. 2023) *(citing United States v. Howard*, 28 F.4th 108, 209 (11th Cir. 2023)). "[E]conomic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, which makes them prime candidates for general deterrence." *Howard*, 28 F.4th at 209. Significant federal prison sentences serve as an important deterrent to help discourage other would-be fraudsters and prevent the future victimization of more innocent investors.

A sentence of 121 months would appropriately reflect the pervasiveness of Woods' Ponzi scheme, which spanned several years and caused over $49 million in loss to over 400 victims, and it would adequately deter other potential fraudsters.

The United States' 121-month sentence recommendation is especially reasonable in light of its recommendation that the Court grant a 2-level downward variance and sentence Woods at the low end of the Guidelines range. These

recommendations take into account the mitigating factors in this case, including that Woods resolved this case pre-indictment and, in doing so, allowed the United States to preserve considerable investigative and litigation resources. A sentence of 121 months is fair, just, and reasonable, appropriately taking into account all of the § 3553(a) factors present in the case, both aggravating and mitigating.

For all the foregoing reasons, the United States respectfully requests that the Court sentence Woods to 121 months, which is a sentence at the low end of the anticipated applicable custody guideline range, and order him to pay restitution to the victims of his fraud.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

/s/ ANGELA ADAMS
*Assistant United States Attorney*
Georgia Bar No. 613114
Angela.Adams@usdoj.gov

/s/ STEPHEN H. MCCLAIN
*Assistant United States Attorney*
Georgia Bar No. 143186
Stephen.McClain@usdoj.gov

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

        David Chaiken, Esq.

January 25, 2024

        /s/ ANGELA ADAMS
        ANGELA ADAMS
        *Assistant United States Attorney*